COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, Causey and Senior Judge Haley
Argued at Richmond, Virginia

MONTEL JALEEK WILSON

v.       Record No. 0780-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE JAMES W. HALEY, JR.
OCTOBER 10, 2023

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

James Joseph Ilijevich for appellant.

Matthew P. Dullaghan, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

A jury convicted Montel Jaleek Wilson of three counts of first-degree murder, three counts
of felony second-degree murder, three counts of abduction with intent to extort money, conspiracy
to commit abduction with intent to extort money, robbery, conspiracy to commit robbery, three
counts of child abuse or neglect, and three counts of child endangerment or cruelty.  All the charges
arose from an incident involving five co-defendants: Durward Allen, James Myers, Hugh Green,
Jamal Bailey, and Wilson.  On appeal, Wilson challenges the sufficiency of the evidence to sustain
his convictions.  He also argues that the trial court erred by (1) denying a motion to sever his trial
from his co-defendants', (2) denying two continuance requests, (3) declining to strike two
prospective jurors for cause, (4) denying a motion for a mistrial based on juror misconduct,
(5) permitting the Commonwealth to elicit testimony regarding his silence in response to police

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

questioning, and (6) improperly emphasizing certain jury instructions. For the following reasons, we affirm the trial court's judgment.

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Michael Coleman was a "high-level" cocaine dealer from Philadelphia, Pennsylvania who redistributed large quantities of cocaine from a drug cartel operating in South Texas and Mexico. In May 2019, he lived in a residence in Spotsylvania County with his girlfriend, R.O., their two small children, G.C. and I.C., and R.O.'s teenage son, K.O. On the afternoon of Sunday May 26, 2019, K.O. was at the residence playing a computer game and chatting online with his friend, C.H. Around 12:30 p.m., C.H. heard someone yell at K.O. K.O. abruptly ended the game and did not respond to further messages.

K.O.'s father, B.J., went to the Coleman residence on the morning of May 29, 2019, because K.O. and R.O. had not responded to his calls or text messages for three days. Coleman's and R.O.'s vehicles were parked outside the residence. After receiving no response to his knocks on the door, B.J. looked in the window and saw Coleman's body lying face down on the kitchen floor. B.J. entered the house through the unlocked front door and went into the kitchen. Coleman's hands were tied behind his back, and his feet were bound together with cords; his throat had been cut, and he had three stab wounds in his right torso. There was a kitchen knife beside Coleman's body. B.J. searched the house and found K.O.'s dead body lying face down

- 2 -

on the bathroom floor. K.O.'s throat had been cut, and his hands and feet were bound in the same manner as Coleman's. B.J. called 911.

Spotsylvania County Sheriff's deputies arrived at the residence and searched the premises. The home had been "ransacked," and Coleman's cell phone and pistol were missing. The officers also found R.O.'s dead body on the floor of a nursery. She had a "ligature" around her neck, her throat had been cut, and her hands and feet were bound with cords. The bodies were decomposing, and pools of "coagulated" blood had formed around each of them. Subsequent autopsies established that Coleman, K.O., and R.O. died from "incised wounds" to their necks.

In the nursery, I.C. was in a baby carrier and G.C. was "crawling" on the floor. I.C.'s diaper contained urine; G.C. had feces covering his body and had severe "diaper rash." There was no food nearby, and both children appeared dehydrated. Later that day, a forensic nurse examined the children and determined that they exhibited symptoms of malnourishment and neglect consistent with having been abandoned for three days.

Deputies collected K.O.'s and R.O.'s cell phones, which were on the ground outside the residence. Data from K.O.'s cell phone established that the last message he sent was at 12:49 p.m. on May 26, 2019. Thereafter, messages to his phone went unanswered. Coleman's vehicle contained cocaine inside a "hollowed out" battery compartment. There were also 50 large cellophane wrappers typically used to package kilograms of cocaine inside Coleman's garage. Deputies later obtained Coleman's banking records, which reflected activity consistent with "money laundering."[1] A narcotics expert determined that a kilogram of cocaine was worth

---

[1] A narcotics distribution expert explained that "money laundering" is the practice of disguising money obtained from illicit drug sales as "legitimate proceeds" by depositing them into business bank accounts.

- 3 -

approximately $38,000 and that it is common for criminals to rob "high-level" cocaine dealers of their money and drugs.

Cell phone records established that a "burner phone"[2] with a Philadelphia, Pennsylvania area code was "activated" on May 23, 2019, and contacted Coleman's phone 111 times between May 23, 2019, and May 26, 2019. On May 25, 2019, the burner phone traveled from Philadelphia to the vicinity of a hotel in Fredericksburg, Virginia before contacting Coleman's cell phone around 2:22 p.m. The phone did not contact Coleman's phone after May 26, 2019.

Investigators obtained a Google "geo-fence search warrant" to identify specific cellular devices that were at Coleman's home between 11:00 a.m. and 2:00 p.m. on May 26, 2019.[3] In response, Google identified a device registered to Green, a Philadelphia resident, as having "logged activity" on Coleman's property during that time frame. Green's cell phone records demonstrated that around that time, his phone communicated with cell phones belonging to Allen, Myers, Bailey, and Wilson, who were also Philadelphia residents. Police later seized cell phones belonging to Green, Allen, Myers, Bailey, and Wilson and obtained search warrants for their cell phone records. Forensic experts determined that between May 25, 2019, and May 26, 2019, the phones traveled together from Philadelphia to Coleman's residence in Spotsylvania County before returning to Philadelphia.

---

[2] The term "burner phone" is a colloquialism for a "prepaid cellular phone[]." Drug dealers typically use such phones to arrange drug transactions because they are "inexpensive" and "can be thrown away" or "destroyed."

[3] A "geo fence" uses "latitude/longitude coordinates" to set a perimeter around a specific location of interest. In response to a "geo-fence search warrant," Google provides police with a "record of any devices" that "logged activity inside" the specified perimeter during a requested time frame.

Detectives subsequently learned that Wilson was the nephew of Coleman's ex-wife. Wilson and Allen were half-brothers, and Bailey and Green were their cousins. Myers was Wilson's neighbor.

During the investigation, detectives learned that Myers was incarcerated in Pennsylvania for an unrelated offense. When they interviewed Myers at the prison, he initially denied any involvement in the murders but later confessed that he had conspired with Green, Allen, Bailey, and Wilson to rob Coleman at his residence on May 26, 2019. Myers said that during the robbery, Green "tied up" Coleman, K.O., and R.O. while the other accomplices searched the premises and stole cocaine, money, and a pistol. Myers said that Green had a knife and "choked" Coleman and R.O. with a belt. Myers claimed he did not see Green kill them. According to Myers, Bailey killed K.O. at Wilson's direction after Myers and Green refused to do so. The group then departed Coleman's residence and returned to Philadelphia, abandoning Coleman's surviving children.

A grand jury subsequently indicted Allen, Myers, Green, Bailey, and Wilson for three counts of first-degree murder, three counts of felony second-degree murder, three counts of abduction with intent to extort money, conspiracy to commit abduction with intent to extort money, robbery, conspiracy to commit robbery, three counts of child abuse or neglect, and three counts of child endangerment or cruelty.

At trial, Myers testified against his co-defendants under a cooperation agreement with the Commonwealth.[4] Myers provided the following account at the trial. Wilson contacted Myers a

---

[4] Myers's written plea agreement established that he pleaded guilty to second-degree murder and conspiracy to commit robbery in exchange for his remaining charges being nolle prossed. The parties agreed that Myers would receive a sentence between 24 years and 4 months' incarceration and 32 years and 5 months' incarceration. The written agreement specified that "any suspended or concurrent portion" of that sentence would be "conditioned upon" Myers providing "complete and truthful testimony" in "any matter related" to his charges.

week before the murders with a plan to rob Coleman. Wilson told Myers that Coleman had cash and a "couple kilos" of cocaine at his residence in Virginia. Wilson had agreed to meet Coleman at his residence to purchase cocaine as a ruse to accomplish the robbery. Wilson, Allen, Bailey, and Green planned to travel to a hotel in Fredericksburg, Virginia on May 25, 2019, "and then do the robbery the following day." Myers agreed to join them.

On May 25, 2019, the group traveled from Philadelphia, Pennsylvania to a hotel in Fredericksburg, Virginia in a van and a Nissan Altima. They had placed dark tint on the windows of the Altima beforehand to prevent Coleman from seeing inside. That evening, Myers and his cohorts did a "test run" to Coleman's house to determine how quickly they could drive there. Afterward, they purchased dark clothing at a Walmart and returned to the hotel, where they spent the night.

The next morning, the group bought gloves at the Walmart and returned to the hotel to wait for Coleman to call Wilson, who was carrying a "burner phone." Coleman called Wilson and initially directed him to drive to Coleman's mother's residence but later instructed him to purchase orange juice and drive to Coleman's residence instead. After purchasing the orange juice at a Walmart, Allen, Wilson, Myers, Bailey, and Green stopped their vehicles by the road to "switch[]" vehicles. Allen drove the van to a park nearby and waited while Myers, Wilson, Bailey, and Green traveled to Coleman's residence in the Altima.

When they arrived at Coleman's residence, Wilson entered the residence and spoke to Coleman while Myers, Bailey, and Green waited in the Altima parked outside. Under the pretense of retrieving money to pay Coleman, Wilson returned to the Altima and "grabbed a gun" and a bag containing the orange juice. Myers, Bailey, and Green then donned masks and followed Wilson into Coleman's house. Myers testified that Wilson and Bailey brandished pistols at Coleman, R.O., and their two small children and ordered them to sit on a couch in the

- 6 -

living room.  Green used cords to tie Coleman's hands behind his back and bind his feet together while Myers did the same to R.O.  While searching for money and cocaine, Myers found K.O. in his bedroom playing a computer game and restrained him in the same manner.

Myers and Green searched Coleman's truck for money and cocaine without success. When they reentered the house, Green "stood [Coleman] up" and "[s]lit his throat" with a curved, "folded knife."  Green did the same to R.O.  Wilson, who was not wearing a mask, then directed Myers and Green to "kill" K.O. because the child had "seen his face."  When Myers and Green refused, Bailey "snatched [Green's] knife" and "slit [K.O.'s] throat."  The group then stole a pistol and a bookbag containing "cash" and "cocaine" from the house and another bag of cash that Bailey had found in Coleman's truck.  They also took Coleman's cell phone and "[t]ossed it out the window" as they departed in the Altima.

After the robbery, Myers, Wilson, Green, and Bailey met Allen at the park and "switched vehicles" again before returning to Philadelphia.  In Philadelphia, they divided the stolen drugs and money.  Myers received "a couple ounces" of cocaine and about $10,000, which he used to purchase a BMW.  Wilson used his share of the robbery proceeds to buy an Audi, Allen bought a Buick, and Bailey purchased a BMW.  Wilson also rented a Lamborghini the week after the robbery.  Myers and his accomplices "[b]urned" the clothing they had worn during the robbery, and Allen later sold Coleman's stolen pistol.

On cross-examination, Myers acknowledged that he was a convicted felon and that he hoped to receive a more lenient sentence for his part in the crimes in exchange for his testimony. In addition, Myers admitted that he initially denied criminal involvement when police questioned him about the offenses.  Myers further acknowledged that he told police that Green "tied up" Coleman, R.O., and K.O. and that Myers did not see Green kill anyone.  Despite minimizing his

own role, Myers expressed remorse for harming the victims and affirmed the veracity of his testimony.

Philadelphia Police Officer Jason Seigafuse testified as a narcotics expert at trial that in 2019 Wilson ran a business selling crack cocaine in his neighborhood in Philadelphia. Green worked for Wilson and supervised about five "workers" who all sold small quantities of crack cocaine. Officer Seigafuse opined that Wilson and Green earned "a couple hundred dollars" per day from the business.

At trial, the Commonwealth introduced data from Wilson's cell phone demonstrating his preparation to commit the offenses. For example, in February 2019, Wilson searched the internet for the address of Coleman's mother's residence and the "crime rate" in Fredericksburg, Virginia. Wilson subsequently deleted records of those searches. On March 9, 2019, Wilson exchanged text messages with Allen's cousin, "Leek," indicating that Wilson had been communicating with a large scale cocaine distributor who lived in Virginia and that Wilson was searching for the distributor's residence so that he could rob him. On March 23, 2019, Wilson sent photographs of Coleman's residence to an associate and texted that he was visiting Virginia "on business." On May 24, 2019, two days before the murders, Wilson sent text messages to his girlfriend, Deanna Perry, discussing plans to travel to Virginia that weekend and directing her to obtain a vehicle with plenty of "space." The Commonwealth introduced a rental car lease agreement for a black Dodge van, signed by Perry, which established that she "picked up" the van from a rental store in Philadelphia at 6:03 p.m. on May 24, 2019, and returned it on May 28, 2019, at 5:21 p.m. Data from Allen's cell phone also established that at 6:50 a.m. on May 25, 2019, he texted his girlfriend, Zierra Griddle, that he had taken her Nissan Altima to a shop in Philadelphia to place dark tint on the car's windows.

FBI Special Agent Jeremy D'Errico testified at trial as an expert in historical cell site location analysis. He analyzed cell phone records for the "burner phone" and the cell phones belonging to Wilson, Green, Bailey, Allen, and Myers. Using that information, Agent D'Errico determined that from 9:45 a.m. to 2:32 p.m., on May 25, 2019, the burner phone and the co-defendants' cell phones traveled along the same route from Philadelphia, Pennsylvania to a hotel in Fredericksburg, Virginia.[5] During that time, the burner phone repeatedly contacted Coleman's cell phone. Between 2:39 p.m. through 4:39 p.m., the phones traveled to a diner and then a Walmart near Coleman's residence before returning to the hotel. From 5:04 p.m. to 5:46 p.m., Green's and Wilson's phones traveled to a road near Coleman's residence before returning to the hotel. Between about 5:46 p.m. on May 25, 2019, through 6:16 a.m. the next morning, the phones remained at the hotel, during which time the burner phone contacted Coleman's cell phone.

Between 6:16 a.m. and 6:54 a.m. on May 26, 2019, Green's phone again traveled from the hotel to a road near Coleman's residence before returning to the hotel. Then, between 10:23 a.m. through 11:43 a.m., the burner phone and Wilson's, Green's, Myers's, and Allen's phones traveled to Coleman's mother's residence and paused briefly before going to the nearby Walmart. From 11:43 a.m. until 12:08 p.m., the burner phone and the co-defendants' phones traveled from the Walmart to a roadway near Coleman's residence and stopped for "three or four minutes."

Around 12:16 p.m., the burner phone and Wilson's, Green's, Bailey's, and Myers's phones traveled to Coleman's residence and remained there until about 1:12 p.m. Meanwhile,

_____

[5] Traffic cameras recorded the black Dodge van and Griddle's Nissan Altima traveling into Virginia. Hotel records established that around 1:24 p.m. on May 25, 2019, Bailey checked into the hotel. He paid cash for two hotel rooms and "check[ed] out" the next morning at 9:54 a.m. In addition, Bailey, Allen, and Wilson signed a "hotel guest waiver" form to access a nearby gym.

Allen's phone traveled to a park north of Coleman's residence and stopped. Finally, from 1:12 p.m. until 5:06 p.m., Wilson's, Green's, Bailey's, and Myers's phones traveled to the park where Allen's phone was located, after which all the phones returned to Griddle's residence in Philadelphia.[6]

The co-defendants' cell phone records also reflected their communications and conduct after the murders. Around 8:49 p.m. on May 26, 2019, Perry texted Wilson a photograph of the black Dodge van and asked whether he wanted "the money that was left in there." Wilson's phone contained a photograph taken two days after the incident depicting a duffel bag containing "a large quantity of cash wrapped in some rubberbands." In the week after the murders, Wilson exchanged text messages with Bailey discussing plans to purchase new vehicles.[7] Wilson also exchanged text messages with Allen discussing purchasing a kilogram of cocaine for $33,000 and hiring new "workers" to sell it in their Philadelphia neighborhood. In addition, the day after the murders, Bailey sent a text message to Allen stating that he had Coleman's stolen pistol and intended to sell it to Bailey's brother.

Wilson denied committing the offenses. Wilson, who already was a convicted felon, testified that he had no reason to rob Coleman because in 2019, he was earning approximately $35,000 per day selling crack cocaine in Philadelphia. Wilson admitted that he and his co-defendants traveled to Coleman's residence[8] but maintained that they did so to conduct a drug

---

[6] Traffic cameras recorded the black Dodge van and Griddle's Nissan Altima traveling north toward Philadelphia during that time.

[7] Between May 26, 2019, and May 31, 2019, Wilson and his co-defendants each bought new cars and Wilson paid $21,000 to rent a Lamborghini.

[8] Wilson acknowledged that he purchased "a new burner phone" before the murders and used it to contact Coleman. In addition, Wilson admitted that he and his co-defendants carried their cell phones when they traveled to Coleman's residence and that the cell phone location data establishing their movements was "a hundred percent accurate."

- 10 -

transaction.  Wilson claimed that about "two weeks" before the murders, Coleman had loaned

him "three kilos" of cocaine to sell in Philadelphia, so he, Allen, Bailey, Green, and Myers went

to his house on May 26, 2019, to repay the loan and purchase "seven or eight" additional

kilograms of cocaine.  Wilson claimed that he and the others arrived at Coleman's house,

conducted the planned drug transaction, and returned to Philadelphia without incident.

The jury convicted Wilson as charged.  Wilson moved to set aside the verdicts, arguing

that Myers's testimony was inherently incredible because "it was the by-product of his

agreement to cooperate with the prosecution."[9]  The trial court denied the motion.  Wilson

appeals.

ANALYSIS

I.  The evidence supports the jury's verdicts.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is

presumed correct and will not be disturbed unless it is plainly wrong or without evidence to

support it.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original)

(quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does

not ask itself whether *it* believes that the evidence at the trial established guilt beyond a

reasonable doubt.'"  *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204,

---

[9] Wilson also moved to set aside the jury's verdicts convicting him of felony second-degree murder in tribunal case numbers CR21-320 through CR21-322 on double jeopardy grounds.  The trial court took that motion under advisement pending this appeal.  This Court has subject matter jurisdiction over "appeals from final criminal convictions and from action on motions filed and disposed of while the trial court retains jurisdiction over the case." *Minor v. Commonwealth*, 66 Va. App. 728, 738 (2016) (emphasis omitted) (quoting *Commonwealth v. Southerly*, 262 Va. 294, 299 (2001)); *see* Code § 17.1-406(A).  "In a criminal case, the final order is the sentencing order."  *Dobson v. Commonwealth*, 76 Va. App. 524, 528 (2023) (quoting *Johnson v. Commonwealth*, 72 Va. App. 587, 596 (2020)).  Here, the trial court did not enter an order disposing of Wilson's motion to set aside the verdicts in case numbers CR21-320 through CR21-322, nor did it enter an order sentencing Wilson for his convictions in those cases.  Accordingly, we do not consider those convictions in this appeal.

228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Wilson contends that the evidence was insufficient to sustain his convictions because Myers's testimony was "inherently incredible" as a matter of law. He emphasizes that Myers provided inconsistent accounts of the incident to police and testified under a cooperation agreement with the Commonwealth. Thus, Wilson maintains that the evidence merely demonstrated his location near Coleman's residence around the time of the offenses, which is insufficient to sustain his convictions. We disagree with Wilson's view of the evidence.

"Determining the credibility of witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them." *Stith v. Commonwealth*, 65 Va. App. 27, 35 (2015) (quoting *Williams v. Commonwealth*, 56 Va. App. 638, 642 (2010)). Accordingly, this Court "will not disturb the fact finder's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Dalton*, 64 Va. App. at 526 (quoting *Walker v. Commonwealth*, 258 Va. 54, 71 (1999)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought

not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Wilson identifies nothing in the record that renders Myers's testimony inherently incredible as a matter of law. At trial, Myers testified unequivocally that Wilson organized and directed the robbery during which Bailey and Green murdered Coleman, K.O., and R.O. and that Wilson, Bailey, Green, and Myers abandoned Coleman's children after stealing Coleman's property. Although Myers initially denied involvement and provided inconsistent descriptions of the incident, it is well-established that inconsistencies in a witness's account do not render his testimony inherently incredible. *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). In addition, a co-defendant's testimony is not inherently incredible merely because he testifies under a plea agreement. *Yates v. Commonwealth*, 4 Va. App. 140, 144 (1987). Rather, the above circumstances were appropriately submitted to and decided by the jury as part of their credibility determination.

Moreover, the balance of the evidence corroborated Myers's testimony and established Wilson's guilt beyond a reasonable doubt. *See Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019) (holding that a witness's testimony was not inherently incredible when it was corroborated by other evidence). Data from Wilson's cell phone demonstrated considerable advanced planning, a circumstance that permitted the jury to infer that the offenses were not crimes of opportunity. Three months before the incident, Wilson searched the internet for Coleman's mother's residence and the "crime rate" in Fredericksburg, Virginia, and then deleted those searches from his phone. Wilson also sent an associate text messages indicating that he had recently contacted a large-scale drug dealer in Virginia and was searching for the dealer's residence so that he could rob him. Two days before the murders, Wilson texted Perry that he

planned to travel to Virginia and directed her to obtain a vehicle with plenty of "space." Rental car company records established that Perry rented the van Wilson used to travel to Coleman's residence.

In addition, cell phone records established that a "burner phone" with a Philadelphia, Pennsylvania area code was "activated" two days before the murders and contacted Coleman's phone more than 100 times. Cell phone records further established that the day before the murders, the burner phone and the co-defendants' cell phones traveled together from Philadelphia, Pennsylvania to Fredericksburg, Virginia and stayed overnight at a hotel. The next day, the phones traveled together to Coleman's residence and then to a park before returning to Philadelphia, as Myers had described during his testimony.

Wilson admitted that he purchased "a new burner phone" before the murders and used it to contact Coleman. Wilson further admitted that he and his co-defendants traveled to Coleman's residence and that the cell phone evidence establishing their movements was "a hundred percent accurate." From the documentary, photographic, and forensic evidence, the jury could infer that Myers's testimony provided an accurate account of the offenses. *Cf. Edwards v. Commonwealth*, 68 Va. App. 284, 299 (2017) (affirming first-degree murder conviction where defendant's cell phone tower location records established his phone's presence at crime scene at the time of the victim's murder).

In sum, the Commonwealth's evidence was competent, not inherently incredible, and permitted the jury to find that Wilson perpetrated the offenses. Accordingly, the trial court did not err in denying Wilson's motion to set aside the jury's verdicts.

II. Wilson's argument that his joint trial with his co-defendants prejudiced him is procedurally defaulted.

Before trial, the Commonwealth moved *in limine* to join the trials of Green, Bailey, and Wilson, under Code § 19.2-262.1 and Rule 3A:10, arguing that the co-defendants were charged

- 14 -

with the same offenses and "participat[ed] in contemporaneous and related acts" to commit them. At the hearing, Green, Bailey, and Wilson did not object to joinder, but reserved the right to move to sever the trials.

Green subsequently moved to sever his trial. In his written motion, Green argued that although substantial evidence—including cell phone records, text messages, and photographs—suggested Bailey's and Wilson's guilt, the evidence against Green was "exceedingly thin" and included "only a few seconds of 4 purported cell phone calls/texts" that he allegedly made to two phones "that have not been definitively linked to him." Accordingly, Green asserted that a joint trial with Bailey and Wilson would prejudice his defense because a jury might "convict[] him by sheer association" with his co-defendants. At a hearing, Wilson joined Green's motion to sever but offered no independent argument regarding why he should be tried separately. Following argument, the trial court denied the motion.

On appeal, Wilson argues that the trial court erred by refusing to sever his trial from his co-defendants' because the evidence established that each co-defendant "carried out separate and distinct actions." In addition, he asserts that Green's and Bailey's "culpability" for the crimes "far exceeded" his; therefore, a "joint trial introduced prejudicial evidence [of their conduct] which outweighed any probative value" and "create[e]d prejudice to" his defense.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). "Specificity and timeliness undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea v.*

- 15 -

*Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

We have held that a party may "rely on the objection of another party to preserve an argument for appeal" by "expressly joining in the objection." *Mollenhauer v. Commonwealth*, 73 Va. App. 318, 330 (2021) (quoting *Linnon v. Commonwealth*, 287 Va. 92, 102 (2014)). Nevertheless, appellate courts "will not consider an argument [on appeal] that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc) (citing *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978)).

We do not consider the merits of Wilson's argument because he failed to preserve it for appellate review. At trial, Wilson did not file a written motion to sever his trial from his co-defendants' or make any independent argument that joinder prejudiced his defense. Rather, he relied entirely on Green's written motion and argument. But Green argued that joinder prejudiced *his* defense, not Wilson's, because the evidence establishing Bailey's and *Wilson's* guilt was substantial in comparison to the evidence implicating Green. Wilson adopted those arguments below but now argues the opposite on appeal. Accordingly, Wilson did not preserve his argument for appellate review. Rule 5A:18. Wilson does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and we will not do so sua sponte. *Edwards*, 41 Va. App. at 761.

III. Wilson did not establish that the trial court's denial of his continuance requests prejudiced him.

## A. First Day of Trial

On the first day of trial, only 51 of the 114 prospective jurors summoned for jury duty appeared for jury selection due to inclement weather. Wilson objected to "going forward" because "essentially half of the jurors ha[d] chosen not to appear." Counsel for Wilson argued that the 51 prospective jurors did not represent a fair cross-section of the community because they comprised only people who "want[ed] to be [t]here." The trial court found that it typically summoned about 40 prospective jurors and that there was "no indication" that the prospective jurors who appeared did not reflect a fair cross-section of the community. Accordingly, the trial court denied the motion.

Wilson contends that the trial court erred by refusing to continue his trial because the 51 prospective jurors who "appeared for jury selection" did not represent a fair "cross-section of the community." Wilson asserts that when he objected to the composition of the venire, the trial court failed to assess the prospective jurors' "gender or racial makeup" and conduct an inquiry to determine whether they "lived, primarily or exclusively, close to the courthouse (thereby only representing a small geographic portion of the county) or had access to transportation (indicative of a possible class disparity)."

"The circuit court's ruling on a motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion *and* resulting prejudice to the [defendant]." *Ortiz v. Commonwealth*, 276 Va. 705, 722-23 (2008) (quoting *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007)). "The absence of one renders inconsequential the presence of the other." *Bolden v. Commonwealth*, 49 Va. App. 285, 290 (2007), *aff'd*, 275 Va. 144 (2008). Prejudice "may not be presumed; it must appear from the record." *Id.* (quoting *Lowery v. Commonwealth*, 9 Va. App. 304, 307 (1990)). Constitutional arguments present questions of law

- 17 -

that we review de novo. *Montgomery Cnty. v. Virginia Dep't of Rail & Pub. Transp.*, 282 Va. 422, 435 (2011).

The Sixth Amendment guarantees trial by an "impartial jury of the state and district wherein the crime shall have been committed." U.S. Const. amend. VI; *see Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). That provision requires "that trial juries represent a fair cross-section of the community." *Brown v. Commonwealth*, 68 Va. App. 746, 773 (2018) (citing *Taylor*, 419 U.S. at 530). "To establish a prima facie violation of the fair-cross-section requirement," the *"defendant must prove* that: (1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury selection process accounts for the underrepresentation." *Prieto v. Commonwealth*, 283 Va. 149, 186 (2012) (emphasis added) (quoting *Berghuis v. Smith*, 559 U.S. 314, 327 (2010)).

Where a criminal defendant does not contend "that the jury selection process was unlawful" and makes "no showing of any policy of, or effort toward, systematic exclusion of . . . any distinctive group in the community" from the jury panel or jury list, his fair cross-section claim must fail. *Watkins v. Commonwealth*, 238 Va. 341, 346-47 (1989). Wilson bore the burden to establish a prima facie fair cross-section claim; it was not the trial court's responsibility to sua sponte investigate the matter. *Prieto*, 283 Va. at 186. In requesting the continuance, Wilson asserted that the 51 prospective jurors who reported for jury duty did not represent a fair cross-section of the community because they "want[ed] to be [t]here." Even assuming that prospective jurors who did not wish to serve comprise a "distinctive" group cognizable under the Sixth Amendment, Wilson did not demonstrate that the trial court's jury selection process systemically excluded members of that group from jury venires or that there was a policy or other effort to exclude them. *See Watkins*, 238 Va. at 346-47 (holding defendant failed to make prima facie fair cross-section claim where he failed to demonstrate that the jury

selection process systematically excluded members of his minority race from venires in that jurisdiction). Thus, Wilson failed to establish a prima facie fair cross-section claim. Accordingly, the trial court did not abuse its discretion by denying Wilson's continuance request on that basis.

## B. Third Day of Trial

On the third day of trial, Wilson's counsel proffered that Wilson was "feverish," had a "headache," and was "unable to focus." Additionally, Wilson had not been "feeling well" the previous day, counsel reported, and seemed "distracted and uncomfortable." Wilson had vomited before court the previous morning and had requested medical attention at the jail but had not "received any actual attention or treatment." Therefore, Wilson requested a one-day continuance. Alternatively, Wilson asked the trial court to "pause the proceedings briefly to allow him to recuperate" and to instruct the jury that he might need to "close his eyes or put his head in his hand" during trial.

The trial court found that Wilson did not appear ill and had "seemed very engaged" during trial. There was also no "medical report" or other evidence demonstrating that Wilson was sick. Accordingly, the trial court denied the continuance but stated, "[w]e're going to proceed this morning, unless it becomes apparent that we can't." During trial, Wilson raised no further objection and did not renew his continuance request.

Wilson now argues that the trial court abused its discretion by refusing his requested continuance because he was "not feeling well." Alternatively, Wilson asserts that the trial court abused its discretion by failing "to conduct any kind of inquiry about [his] physical state" before proceeding with trial to ensure that Wilson was "able to assist in his defense."

Wilson fails to identify anything in the record demonstrating that he suffered specific prejudice from the trial court's denial of his continuance request. "The circuit court's ruling on a

motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion *and resulting prejudice to the [defendant].*" *Ortiz*, 276 Va. at 722-23 (emphasis added) (quoting *Haugen*, 274 Va. at 34). "The absence of one renders inconsequential the presence of the other." *Bolden*, 49 Va. App. at 290. Prejudice "may not be presumed; it must appear from the record." *Id.* (quoting *Lowery*, 9 Va. App. at 307). The record demonstrates that despite Wilson's purported illness, he ably testified and presented his version of events. Accordingly, we "need not address" Wilson's "abuse-of-discretion argument because we find no merit in his claim of prejudice."[10] *Id.*

IV. The trial court did not abuse its discretion by refusing to strike Jurors 30 and 52 for cause.

Before trial, Green moved *in limine* to preclude the Commonwealth from mentioning during voir dire or opening statements that Myers and Allen had accepted plea agreements and pleaded guilty to their charges. Green argued that such evidence was inadmissible "unless and until" Myers or Allen each testified at trial. The trial court granted the motion and prohibited the Commonwealth from mentioning during voir dire or opening statements that Myers and Allen had pleaded guilty.

Before voir dire on the first day of trial, Bailey introduced a newspaper article dated January 2, 2022, as an exhibit in support of an unrelated "motion to change venue" due to pretrial publicity regarding the case. The article disclosed that Myers and Allen were Wilson's co-defendants and had "reached plea agreements with the prosecution." Myers had "pled guilty" to second-degree murder and conspiracy to commit robbery in exchange for having "numerous other charges dropped," and Allen "pled guilty to robbery and using a firearm in the commission

---

[10] Moreover, Wilson failed to preserve his specific argument that the trial court did not adequately investigate his purported illness because he did not raise that argument in the trial court. Rule 5A:18. Wilson does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and we will not do so sua sponte. *Edwards*, 41 Va. App. at 761.

of a felony." The article described the alleged offenses and the Commonwealth's anticipated evidence.

During voir dire, the trial court instructed the prospective jurors on the law regarding the presumption of innocence and burden of proof and asked whether anyone did not understand or agree with those principles. None of the prospective jurors responded. When the trial court asked whether any of the prospective jurors knew "of any reason" that they could not "give a fair and impartial trial" to the parties "based solely on the evidence," none responded. The trial court then asked, without objection, whether anyone had read the newspaper article "about this case" that was published the previous week. Several jurors raised their hands, including Jurors 30 and 52. The prosecutor asked those jurors whether they had "any preconceived notions" regarding Wilson's and his co-defendants' guilt or innocence. Juror 52 replied, "Not really," and Juror 30 answered, "No, sir." Neither Wilson nor his co-defendants questioned either juror regarding the article or their understanding of it.

Wilson moved to strike Jurors 30 and 52 for cause. He proffered that the article disclosed that Myers and Allen had accepted "plea deal[s]" and had pleaded guilty to their charges. Acknowledging that he did not question either juror regarding "the content" of the article, Wilson nevertheless maintained that they *may* have learned that Myers and Allen had pleaded guilty and, thus, acquired "information" that the trial court had ruled was inadmissible. Wilson asserted that the "information" was "so prejudicial" that Jurors 30 and 52 could not be impartial. The trial court found that Jurors 30 and 52 "said they could be impartial" and that there was "no evidence to believe" they could not be impartial "notwithstanding their reading the article." Accordingly, the trial court refused to strike the jurors for cause.

Wilson argues that the jurors were not impartial because they had read the article disclosing that Myers and Allen had pleaded guilty. Wilson emphasizes that the trial court's

- 21 -

pretrial ruling prohibited the Commonwealth from mentioning Myers's and Allen's guilty pleas during voir dire and opening statements because that information was prejudicial and argues that the jurors might have learned that information by reading the article. Wilson concedes that he did not question the jurors to determine whether they had, in fact, learned of Myers's and Allen's guilty pleas but maintains that he could not do so "in front of the rest of the venire" without "making known to all what [Wilson] had previously sought to exclude." Wilson argues that the trial court "should have recognized that impediment" and presumed that the jurors were not impartial. We disagree.

On appellate review, "this Court gives significant deference to a trial court's decision to strike a prospective juror or not, 'because the trial court was able to see and hear each member of the venire respond to the questions posed.'" *Ramos v. Commonwealth*, 71 Va. App. 150, 157 (2019) (quoting *Lovitt v. Commonwealth*, 260 Va. 497, 510 (2000), *cert. denied*, 534 U.S. 815 (2001)). Thus, we review a trial court's decision whether to strike a prospective juror for cause "for an abuse of discretion and [the trial court's] ruling will not be disturbed on appeal unless it appears from the record that the trial court's action constitutes manifest error." *Id.* (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 755 (2000)). "In conducting our review, we consider the juror's entire *voir dire*, not merely isolated statements." *Id.* (quoting *DeLeon v. Commonwealth*, 38 Va. App. 409, 413 (2002)).

The right to an impartial jury is protected by the United States and Virginia Constitutions and by statute. U.S. Const. amend VI; Va. Const. art. I, § 8; Code §§ 8.01-357, -358. "If [a juror] has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60-61 (2011) (quoting *Spangler v. Ashwell*, 116 Va. 992, 996-97 (1914)). "Although a potential juror may have some knowledge of the case, or

- 22 -

preconceived or even erroneous notions about the legal system, the 'test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial.'" *Ramos*, 71 Va. App. at 157 (quoting *Griffin v. Commonwealth*, 19 Va. App. 619, 621 (1995)).

"When the prospective juror learns about separate proceedings involving a co-defendant, the extent of the venireperson's knowledge about the other case will be critical in determining whether they can remain impartial." *Id.* at 159.

> A prospective juror who vaguely knows that another person was convicted of some crime will not need to be excluded on that basis, but a prospective juror who knows the details of the other case and how it is connected to the case for which he is being considered might warrant further questioning about potential bias.

*Id.* at 159-60. "The trial court would need to evaluate that individually." *Id.* at 160.

Consistent with those principles, we have affirmed a trial court's refusal to strike prospective jurors for cause even though they read an article reporting that a co-defendant had been convicted. *Id.* at 159-60. Similarly, in *Jackson v. Commonwealth*, 267 Va. 178, 194 (2004), the Virginia Supreme Court found no error in a trial court's refusal to strike a juror for cause although she had read an article disclosing the details of the alleged offense. The Court emphasized that although the juror initially testified that she would "probably" require the defendant to prove his innocence, she later acknowledged that she had not "formed an opinion" regarding the defendant's guilt or innocence and could "put aside any opinions or thoughts" derived from the newspaper article. *Id.*

Wilson did not establish that either juror had any preconceived or fixed opinions about the case. Wilson did not question either individually to determine what they recalled or understood from the article. *See Ramos*, 71 Va. App. at 159-60 (finding no error where trial court refused to exclude jurors based on article disclosing co-defendant's guilty plea where

defendant did not question the jurors regarding the extent of their knowledge of the co-defendant's case). The record before this Court demonstrates that Jurors 30 and 52 acknowledged that they understood that Wilson was presumed innocent and maintained that they did not have any "preconceived notions" regarding his guilt or innocence after reading the article. They confirmed that they could "give a fair and impartial trial" to Wilson "based solely on the evidence" presented. *See Jackson*, 267 Va. at 194 (finding no error in trial court's refusal to strike juror who read article discussing defendant's charges but who had not "formed an opinion" regarding his guilt or innocence and asserted that she could "set aside" her views regarding the article). *But see Farrar v. Commonwealth*, 201 Va. 5, 9 (1959) (imputing bias to prospective jurors who were present during co-defendant's arraignment and heard his charges that mentioned defendant's name).

In sum, Wilson did not establish that Jurors 30 and 52 were subject to strikes for cause.[11] *Ramos*, 71 Va. App. at 157.

> V. The trial court did not abuse its discretion by denying Wilson's motion for mistrial based on purported juror misconduct.

During jury selection on the first day of trial, the trial court asked whether the prospective jurors knew any of the victims. None of the jurors, including Juror 52, responded. Juror 52 ultimately was selected to serve as an alternate juror. After the jury was impaneled, the trial court admonished them not to discuss the case with anyone other than their fellow jurors or to conduct independent research regarding the case. On the fourth day of trial, during a lunch recess, the trial court notified the parties that it had received a letter from Juror 52. The letter

---

[11] To the extent that Wilson argues that the trial court precluded him from questioning Juror 30 and Juror 52 individually regarding the article or "should have recognized" that Wilson was unable to do so "in front of the rest of the venire," the record does not support Wilson's contention. To the contrary, the trial court offered to let Wilson question both jurors about the article but he declined to do so.

stated, "it has come to my attention that the victim in this case has some family ties to my family which [I] did not know at the start of this trial." Additionally, the letter stated that serving as a juror was causing Juror 52 financial hardship.

Outside the presence of the other jurors, the trial court placed Juror 52 under oath and permitted the parties to question him regarding his letter. Green asked Juror 52 whether he was related to any of the victims. Juror 52 answered that he was "not related" to any of the victims but his family had "ties" to them. Juror 52 confirmed that he had not "communicated" those "family ties to anybody else on the jury." Juror 52 also acknowledged that he had "a number of financial concerns," but did not specify what those concerns were. The trial court then "excused" Juror 52 without objection.

After trial but before sentencing, Wilson moved for a mistrial, arguing that Juror 52's purported dishonesty during voir dire denied him an impartial jury. Wilson asserted that Juror 52 did not disclose his "family ties" when asked on voir dire whether he was related to any of the victims. Wilson thus argued that Juror 52 "fail[ed] to answer honestly a material question on voir dire and his correct responses would have provided a valid basis for a challenge for cause." Additionally, Wilson argued that Juror 52 must have learned about his "family ties" by "communicating with outside parties" about the case and deliberately "withheld" that information during voir dire. Accordingly, he asserted that Juror 52 was biased against him and a new trial was required.

The trial court found that although Juror 52 did not disclose his "family ties" until the final day of trial, there was "no indication that it had come to his attention earlier" or that it prevented the juror from being impartial. The court further noted that it had excused the alternate juror "without objection." Accordingly, the trial court denied the motion for mistrial.

- 25 -

Wilson asserts that he was entitled to a mistrial because Juror 52 failed to answer honestly a material question on voir dire by deliberately failing to disclose his "family ties" when a truthful answer would have provided a valid basis for a challenge for cause. In addition, Wilson argues that Juror 52 "must have" discovered his "family ties" "through independent investigation or speaking with someone about his jury service," thus "ignoring" the trial court's directive not to do so. Wilson concludes that Juror 52 was biased against him and the trial court was required to order a new trial.

"[J]uror impartiality [is] a factual determination, disturbed on appeal only for 'manifest error.'" *Nelson v. Commonwealth*, 41 Va. App. 716, 731-32 (2003) (second alteration in original) (quoting *David v. Commonwealth*, 26 Va. App. 77, 81 (1997)), *aff'd*, 268 Va. 665 (2004). This Court will not reverse "the denial of a motion for a mistrial . . . unless there exists a manifest probability that [the ruling] was prejudicial." *Id.* at 732 (alterations in original) (quoting *Taylor v. Commonwealth*, 25 Va. App. 12, 17 (1997)). We review the trial court's legal conclusions and questions of constitutional interpretation de novo. *Walker v. Commonwealth*, 74 Va. App. 475, 506 (2022).

Virginia recognizes implied bias claims based on juror dishonesty during voir dire and actual bias claims based on "additional circumstances occurring outside the voir dire." *Blevins v. Commonwealth*, 267 Va. 291, 298 (2004). To succeed on an implied bias claim, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Porter v. Warden of Sussex I State Prison*, 283 Va. 326, 327 (2012) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* (quoting *McDonough Power Equip.*, 464 U.S. at 556). Moreover, only

"*intentionally*" false answers to material questions on voir dire satisfy the first prong under *McDonough*. *Blevins*, 267 Va. at 297 (emphasis added).

By contrast, to succeed on an actual bias claim, a party must demonstrate at a hearing that the juror had "actual bias" against him. *Id.* at 298 (citing *Fitzgerald v. Greene*, 150 F.3d 357, 362-63 (4th Cir. 1998)). If the defendant fails at a hearing to demonstrate that a juror had actual bias, then the trial court is not required to order a new trial. *Id.*

Under the above principles, the Virginia Supreme Court has found that a defendant failed to establish an implied bias claim under *McDonough* even though the juror failed to disclose that she was the victim of a robbery during voir dire because she later testified that she did not "deliberately withhold" that information. *Id.* at 297. The defendant also failed to demonstrate that the juror had "actual bias" against him because, at a post-trial hearing, the juror maintained that the robbery did not affect her impartiality and she judged the defendant's case based solely on the evidence. *Id.* at 297-98.

Here, Wilson failed to establish an implied bias claim under *McDonough* because he did not demonstrate that Juror 52's failure to disclose his "family ties" to the victims during voir dire was intentional. *Id.* Indeed, Juror 52's letter and uncontradicted testimony established that he was unaware that his family was related to any of the victims until the final day of trial, whereupon he promptly notified the trial court. *Cf. id.* at 297 (holding defendant failed to meet *McDonough*'s first prong where juror testified that she did not deliberately withhold fact that she was a robbery victim).

In addition, Wilson failed to demonstrate that Juror 52 had actual bias against him. Juror 52's letter stated that he was unaware of his family's relationship to the victims at "the start" of trial. After receiving the letter, the trial court afforded Wilson an opportunity to question Juror 52 regarding the nature and extent of his "family ties" and the circumstances in which he

discovered them but Wilson declined to do so. Thus, Wilson's assertion that Juror 52 must have learned about his relatives' association with the victims "through independent investigation" or discussing the case with his family is speculative. Moreover, Juror 52 had previously testified during voir dire that he did not have any "preconceived notions" regarding Wilson's guilt or innocence and would "give a fair and impartial trial" to the parties "based solely on the evidence." *Cf. Nelson*, 41 Va. App. at 730-31 (finding "speculative" defendant's claim that juror's non-disclosure of her relationship to victim's parent during voir dire proved she was biased where nothing established that the juror deliberately withheld that information and she testified that she was unbiased).

In sum, Wilson failed to demonstrate that Juror 52 intentionally failed to disclose his "family ties" to the victims during voir dire or that Juror 52 had actual bias against Wilson. Accordingly, the trial court did not err by refusing to order a new trial.

VI. Any error in admitting evidence implicating the defendant's exercise of his right to silence during police questioning was harmless beyond a reasonable doubt.

During its case-in-chief, the Commonwealth asked Spotsylvania County Detective Jesse Hanrahan, the "lead" investigator, whether he had attempted to find the "burner phone" and Coleman's "personal cell phone" during his investigation. The detective testified that he had been unable to find the phones despite his attempts to do so. He wanted to search the devices to determine "the content of the communications between Wilson and Coleman" before the murders. Detective Hanrahan explained that he "needed the content" of the communications to "establish the identity of the [person]" who used the "burner phone" to contact Coleman before the offenses. The Commonwealth noted that Wilson and his co-defendants would admit at trial that they went to Coleman's residence and asked the detective, "was that the story from the defendants all the way up until . . . the start of this trial?"

- 28 -

Before Detective Hanrahan could respond, Wilson objected and requested a sidebar. During the sidebar, Wilson asserted that the last question implicated his constitutional right to remain silent during police questioning under *Doyle v. Ohio*, 426 U.S. 610 (1976), and that the prosecutor impermissibly invited the detective to "comment on" his exercise of that right. Additionally, Wilson proffered that although Green and Bailey may have initially denied being present at Coleman's house, there was no evidence that "police ever attempted to speak with him" or that he "made any statements to the police." Wilson thus objected to "being lumped in with the other defendants" and moved for a mistrial.

The Commonwealth countered that the question was "not specifically designed to draw any attention towards . . . Wilson's Constitutional right to remain silent." Rather, the Commonwealth maintained that it had asked the question to explain why Detective Hanrahan had searched for the missing phones. The Commonwealth proffered that it anticipated that Wilson would attempt to argue that the evidence was insufficient to establish that he perpetrated the offenses because Detective Hanrahan never found the phones. The Commonwealth further proffered that Green and Baily "made statements to police denying" that they had traveled to Coleman's house around the time of the incident but later admitted that they did so. Additionally, while in jail pending trial, Green and Bailey placed phone calls during which they "denied that they were ever" at Coleman's house. Consequently, Detective Hanrahan "follow[ed] up . . . to find evidence to actually put them there" at the crime scene.

The trial court found that when Wilson objected, it was not "clear" whether the Commonwealth was asking Detective Hanrahan to identify "specific statements" that Wilson or his co-defendants made to police. Therefore, the court held that the question did not "rise to any comment on these defendants exercising their rights to remain silent." Accordingly, the trial court denied Wilson's motion for mistrial.

The court nevertheless held that if Wilson or his co-defendants had, in fact, made statements to police denying being at Coleman's residence, then those statements were admissible as party admissions. Accordingly, the trial court ruled that it would allow the Commonwealth to question Detective Hanrahan outside the jury's presence to attempt to lay a foundation to admit those statements, "if they exist[ed]."

The Commonwealth declined the court's offer and stated that it would "just move on" and not "pursue" "th[at] line of questioning" "in front of the jury." The trial court instructed the jurors to "disregard the last question." The Commonwealth did not return to the challenged question or reference it again during trial.

Wilson argues that the trial court erred by refusing to grant his request for a mistrial because the Commonwealth's question constituted an improper "commentary on [his] decision to exercise his Fifth Amendment right to remain silent" during police questioning. He asserts that the prosecutor's "intention was clear that he wished to bring forth a comment about [Wilson's] previous silence so he could argue later that any theory offered at trial had not been previously stated." We disagree.

Whether to grant a mistrial rests within the sound discretion of the trial court. *Nelson*, 41 Va. App. at 731-32. This Court will not reverse "the denial of a motion for a mistrial . . . unless there exists a manifest probability that [the ruling] was prejudicial." *Id.* at 732 (alterations in original) (quoting *Taylor*, 25 Va. App. at 17). We review the trial court's legal conclusions and questions of constitutional interpretation de novo. *Walker*, 74 Va. App. at 506.

In *Doyle v. Ohio*, the Supreme Court of the United States held that the Fourteenth Amendment's Due Process Clause prohibits "the use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving *Miranda* warnings." 426 U.S. at 619 (citing *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966)); *accord Caprino v. Commonwealth*, 53

Va. App. 181, 185 (2008). Accordingly, the prosecution may not reference a defendant's "post-arrest, post-*Miranda* warnings silence" during witness examination or in closing argument to impeach the defendant. *Robinson v. Commonwealth*, 14 Va. App. 91, 93 (1992) (quoting *Durant v. Commonwealth*, 7 Va. App. 454, 460 (1988)).[12]

Regardless, assuming that the prosecutor's question to Detective Hanrahan constituted a *Doyle* violation, any error was harmless. "Constitutional error, like other types of error, remains subject to analysis under the doctrine of harmless error." *Commonwealth v. White*, 293 Va. 411, 420 (2017) (quoting *Foltz v. Commonwealth*, 284 Va. 467, 472 (2012)); *see also* Code § 8.01-678 (mandating harmless error review in all cases). "The proper inquiry for constitutional harmless error is 'whether the [jury] *would have* returned the same verdict absent the error.'" *White*, 293 Va. at 421-22 (quoting *Washington v. Recuenco*, 548 U.S. 212, 221 (2006)). "[W]hether such an error is harmless in a particular case depends upon a host of factors," including the "importance of the [tainted evidence] in the prosecution's case, whether [that evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [tainted evidence] on material points . . . [and] the overall strength of the prosecution's case." *Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (second, third, fourth, and fifth alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

---

[12] Similarly, the Fourteenth Amendment's Due Process Clause prohibits the prosecution from using a defendant's "pre-arrest silence in response to a police officer's question as substantive evidence of guilt," *Taylor v. Commonwealth*, 26 Va. App. 485, 499 (1998), although such evidence "is proper for impeachment," *Durant*, 7 Va. App. at 460. To the extent that Wilson's argument challenges the Commonwealth's reference to his pre-arrest silence in response to police questioning, his argument is waived because he did not raise it in the trial court. Rule 5A:18. Wilson asserted only that the prosecutor's question implicated his right to remain silent in response to police questioning under *Doyle*, which applies only to an accused's post-arrest, post-*Miranda* silence. Wilson does not invoke Rule 5A:18's good cause or ends of justice exceptions, and we decline to do so sua sponte. *Edwards*, 41 Va. App. at 761.

In the specific context of erroneously admitted evidence of a defendant's post-arrest, post-*Miranda* silence, other factors relevant to harmless error analysis include "[t]he use to which the prosecution puts" the improperly-admitted evidence, "[w]ho elected to pursue the line of questioning," "[t]he intensity and frequency of the reference," and whether the trial court provided "curative instructions." *Williams v. Zahradnick*, 632 F.2d 353, 361-62 (4th Cir. 1980). In *Greer v. Miller*, 483 U.S. 756, 759-67 (1987), the Supreme Court of the United States found that although a prosecutor improperly asked the defendant during cross-examination why he did not disclose his hypothesis of innocence to police after receiving *Miranda* warnings, the error was harmless beyond a reasonable doubt because the defendant's "postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference" and the unchallenged evidence overwhelmingly established his guilt. The Court noted that the defendant did not answer the disputed question, the trial court instructed the jury to disregard the question, and the prosecutor "did not pursue the issue further" or "mention it during his closing argument." *Id.* at 759-67.

Similarly, Wilson objected to the challenged question before Detective Hanrahan could answer it. So the jury did not hear any testimony or argument regarding Wilson's invocation of his right to silence during police questioning. Further, the trial court instructed the jury to disregard the question and the prosecutor did not return to it or reference it during trial. It is well-established that "juries are presumed to follow prompt, explicit, and curative instructions." *Tizon v. Commonwealth*, 60 Va. App. 1, 14 (2012) (quoting *Elliott v. Commonwealth*, 267 Va. 396, 418 (2004)). Thus, Wilson's "postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Greer*, 483 U.S. at 764-65. Moreover, as discussed above, the balance of the evidence overwhelmingly established Wilson's guilt. Accordingly, we can be confident that even "absent the error," the jury would have found

Wilson guilty beyond a reasonable doubt. *White*, 293 Va. at 421-22 (quoting *Recuenco*, 548 U.S. at 221).

VII. Wilson's argument that the trial court erred by emphasizing certain jury instructions is procedurally defaulted.

Before closing arguments, the trial court instructed the jury that to prove "second degree felony murder," the Commonwealth was required to establish beyond a reasonable doubt that (1) "the defendant killed [K.O.]"; (2) "the killing was caused by acts performed in the commission of a conspiracy to commit robbery or a conspiracy to commit abduction as that crime is separately defined"; and (3) "the killing and the conspiracy to commit robbery or the conspiracy to commit abduction were parts of one continuous transaction and were closely related in time and place."[13]

In addition, the trial court provided several instructions on accomplice liability. Instruction 44 defined a "principal in the first degree" as "the actual perpetrator of the crime." Instruction 45 defined a "principal in the second degree" as "a person who did not actually commit the crime, but rather [wa]s present and knowingly assist[ed] by helping the commission of the crime." Instruction 46 stated that "[a] person is considered present at the scene of a crime if he was in a place to render assistance in the commission of the crime." Finally, Instruction 47 defined concert of action.

After retiring to deliberate, the jury asked the trial court, "Do you have to commit murder to be guilty of 2nd degree or just be a party to it? Instruction 32 line 1 states: That the defendant killed [K.O.]." The trial court alerted the parties and proposed answering the question by reading

---

[13] Wilson does not argue that this instruction erroneously defined the elements of second-degree felony murder. In fact, Wilson agreed to the instruction at trial. "[A]n agreed jury instruction becomes the law of the case, even if it imposes 'an inappropriate standard.'" *Smith*, 296 Va. at 462 (quoting *Owens-Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 136 (1992)). Accordingly, we do not consider whether the trial court erred by so instructing the jury.

Instructions 44 and 45 to the jurors again. In response, Wilson did not object but asked the trial court "to simply refer . . . to the instructions in a general way without pointing them to any specific . . . instruction." The trial court held that it was "obligated to answer the question" by reading Instructions 44 and 45 to the jury. Accordingly, the court denied Wilson's request and re-read Instructions 44 and 45 to the jury.

Wilson argues now for the first time on appeal that the trial court erred by refusing to answer the jurors by directing them to review all the jury instructions rather than only Instructions 44 and 45. He asserts that "by re-reading" those instructions, the trial court "emphasized" them "over all other instructions and created a circumstance where the jury saw the Court's answer as a directive towards its verdict."

We do not address Wilson's argument because he failed to preserve it for appellate review. Objections must be "both *specific* and timely." *Bethea*, 297 Va. at 743 (emphasis omitted). "A general argument or an abstract reference to the law is not sufficient to preserve an issue." *Edwards*, 41 Va. App. at 760 (citing *Buck v. Commonwealth*, 247 Va. 449, 452-53 (1994)). Wilson did not object to the trial court's proposal to answer the jurors' question by reading Instructions 44 and 45 to them again. Moreover, Wilson did not make the specific argument that doing so "emphasized" those instructions over the others and improperly influenced the jury's verdicts. Consequently, that argument is waived. *Id.* Wilson again does not invoke Rule 5A:18's ends of justice or good cause exceptions, and we decline to do so sua sponte. *Edwards*, 41 Va. App. at 761.

## CONCLUSION

For the above reasons, we affirm the trial court's judgment.

*Affirmed.*